Marvin M. TRIETSCH, Appellant–
Plaintiff,

v.

CIRCLE DESIGN GROUP, INC., Kerry Smith, Rita J. Smith, Jeffery L. Wylie, and William R. Stella, as Members of the Board of Directors of Circle Design Group, Inc., and as Individuals, Appellees–Defendants.

No. 49A04–0603–CV–153.

Court of Appeals of Indiana.

June 19, 2007.

Steven H. Johnsonbaugh, Indianapolis, IN, Attorney for Appellant.

Lante K. Earnest, Charles R. Whybrew, Tabbert Hahn Earnest & Weddle, LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

KIRSCH, Judge.

Marvin M. Trietsch ("Trietsch") appeals the trial court's grant of summary judgment in favor of defendants Circle Design Group, Inc. ("CDG") and its board of directors, Kerry Smith, Rita J. Smith, Jeffery L. Wylie, and William R. Stella (collectively the "Directors"). We restate Trietsch's issue and its various subparts as: whether the trial court properly granted summary judgment in favor of CDG and the Directors on Trietsch's claims, which allege violations of Indiana's dissenter's rights statutes, breaches of fiduciary duties, and conversion.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In Trietsch's view, this case "arises out of the willful and intentional efforts of four of the five shareholders in a small closely held corporation to wrongfully deprive the fifth shareholder [Trietsch] of his 21.2% ownership interest in [CDG]." *Appellant's Br.* at 3. The relevant history is that in 1982, Trietsch and the Directors incorporated CDG, a closely-held corporation. Over the next twenty years, Trietsch was a full-time employee of CDG and also served as an officer and director of the corporation. On July 1, 2002, CDG held a special board of directors meeting, and on July 2, 2002, the Directors terminated Trietsch's employment with CDG; however, he remained one of the five shareholders of the corporation.

On September 1, 2004, CDG issued a notice to shareholders of an upcoming shareholder meeting to be held on Septem-

ber 16, 2004. The notice indicated that on the agenda for the September 16 meeting was the "sale of substantially all of the assets of the Company." *Appellant's App.* at 128. The notice did not state anything regarding the right of shareholders to dissent at the meeting or otherwise mention dissenters' rights under Indiana law.

Prior to the date of the meeting, on or around September 10, 2004, Trietsch received an offer from CDG to purchase his shares for $118,000.00 over ten years, which CDG opined represented the fair value of Trietsch's stock. CDG's opinion of the stock's fair value was based upon a "limited valuation report" prepared by Somerset Accountants and Advisors ("Somerset") at CDG's request. *Id.* at 130–33. Trietsch rejected the offer.

At the September 16 meeting, the Directors voted to sell substantially all of CDG's assets to a company called 345, Inc. ("345"). Rita Smith was the sole owner, officer and director of 345. Kerry Smith, Wylie, and Stella were employees of 345, but had no ownership interest in the company, nor were they officers or directors of it. Trietsch attended the September 16 meeting and voted against the proposed sale to 345. Immediately after the meeting, CDG sold substantially all of its assets to 345 pursuant to an Agreement for Purchase and Sale of Assets;[1] in exchange, 345 executed a promissory note in the amount of $345,904 in favor of CDG.

The parties continued to exchange correspondence through their attorneys regarding the matter of Trietsch's stock, its value, and compliance or noncompliance with Indiana's business corporation law and dissenter's rights statutes. Trietsch propounded various discovery requests upon CDG and the Directors, seeking corporate and personal financial information.

In response, CDG sent various corporate documents to Trietsch including balance sheets, profit and loss statements, articles of incorporation, bylaws, annual reports, tax asset detail reports, and an accounts receivable aging summary. In November 2004, CDG sent to Trietsch a promissory note for $118,000.00 and the first payment of that note. CDG also requested that if Trietsch disagreed, he should, pursuant to statute, provide CDG with a written statement of his estimate of the fair value of the stock. Shortly thereafter, Trietsch returned the check and note to CDG.

On December 16, 2004, Trietsch filed a four-count lawsuit against CDG and the Directors, stemming from the sale of CDG to 345. Count I alleged that Trietsch suffered damages as a result of the sale of CDG's assets; Count II alleged that CDG failed to follow the proper procedures for the sale as required by Indiana's dissenter's rights statutes; Count III alleged that the sale to 345 constituted an improper loan to the Directors; and Count IV asserted a claim for conversion and sought attorneys fees.

About a month later, on January 17, 2005, CDG issued another notice of shareholder meeting to be held on January 28, 2005. This notice included a notice of dissenters' rights and listed on its agenda ratification of the sale of assets that occurred on September 16, 2004. On January 27, Trietsch's counsel sent a letter to CDG's counsel advising that Trietsch was reserving all his rights, claims, and remedies against CDG and the Directors (collectively the "Defendants"), and made a demand for payment of his interest. Trietsch appointed a proxy to attend the January 28 meeting for him, and the proxy

---

1. Pursuant to the Agreement, CDG changed its name to 789, Inc.; however, for simplicity purposes we will continue to refer to 789, Inc. as CDG.

voted against ratification of the prior sale of assets to 345.

On February 4, 2005, Defendants' counsel sent a letter to Trietsch, via his counsel, which included: (1) a dissenter's notice; (2) a request that Trietsch's demand for payment be sent to CDG's counsel; (3) a form for making that demand; (4) a copy of Indiana's dissenter's rights statutes; and (4) a notice that Trietsch's demand was due on or before March 8, 2005. *Appellant's Br.* at 20. On February 8, 2005, CDG and the Directors tendered a check to Trietsch in the amount of $118,000.00, which they stated represented CDG's estimate of the fair value of Trietsch's shares. Trietsch accepted the tender in the amount of $118,000.00,[2] but expressly stated that he was "reserving his rights" to demand payment of his value of the shares, less the $118,000.00 already paid, along with any other damages that might be available. *Appellant's App.* at 446. Trietsch did not thereafter provide CDG with what he believed constituted the fair value for his shares, explaining that it was "impossible" for him or his expert to arrive at an estimate of fair value without more detailed financial data from the CDG and the Directors.[3] *Id.*

On September 14, 2005, the Defendants filed a motion for summary judgment. In it, they asserted that the undisputed evidence showed that (1) Trietsch waived any right to receive any additional payment from CDG because he failed to provide CDG with a demand of his estimate of fair value; (2) Trietsch may not recover damages for CDG's alleged violations of Indiana's dissenter's rights statutes; (3)

Trietsch may not recover damages relating to the sale of assets set forth in the sale agreement because he is limited to the exercise of dissenter's rights; and (4) Trietsch's conversion claims fail because CDG did not exercise unauthorized control over Trietsch's property. In October 2005, Trietsch filed a response to the Defendants' motion and a summary judgment motion seeking judgment in his favor. The trial court conducted a hearing in November 2005 and took the matter under advisement.

Meanwhile, throughout most of 2005, the parties were engaging in a discovery dispute over what documents CDG and the Directors should be required to produce. The greatest dispute concerned the production of the Directors' personal financial records, such as tax returns and records of personal investment accounts. Ultimately, the trial court sided with the Directors and ordered that they were not required to produce any documents related to their personal financial affairs. *Appellant's App.* at 702–03.

In February 2006, the trial court issued an order summarily granting Defendants' motion for summary judgment. *Id.* at 10. Trietsch now appeals.

### DISCUSSION AND DECISION

On appeal, the standard of review of a summary judgment motion is the same as that used in the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law.

---

**2.** We note that, pursuant to court order of February 16, 2006, Defendants paid an additional $3,802.22 to Trietsch in interest for the period from September 14, 2004 through February 8, 2005. *Appellant's App.* at 714.

**3.** We note that on prior occasions during the course of the parties' dispute, Trietsch had asserted that his shares were worth $400,000 (July 8, 2002) and, later, $396,016 (September 8, 2003). *Appellant's App.* at 63–66; 323; 494. CDG rejected both of Trietsch's opinions of fair value.

Ind. Trial Rule 56(C); *Tobin v. Ruman,* 819 N.E.2d 78, 83–84 (Ind.Ct.App.2004), *trans. denied* (2005); *Galligan v. Galligan,* 741 N.E.2d 1217, 1221 (Ind.2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Galligan,* 741 N.E.2d at 1221. The review of a summary judgment motion is limited to those materials designated to the trial court. *Id.;* T.R. 56(H).

## I. Dissenters' Rights Statutes

In large part, this case rises and falls on the application of Indiana's dissenters' rights statutes, IC 23–1–44–1 to –20. Those statutes impose obligations both on the corporation and on the shareholder who seeks to dissent to a proposed corporation action, such as a merger or sale of assets; they also impose consequences for a party's failure to comply with the obligations. The trial court granted summary judgment in favor of Defendants on the four counts of Trietsch's complaint. We must determine the appropriateness of that action. We begin by reviewing the dissenters' rights statutory scheme.

■ The sale of all or substantially all of a corporation's assets triggers dissenters' rights. IC 23–1–44–8. When a proposed corporate action that triggers dissenters' rights is to be voted on at a shareholder meeting, the meeting notice must advise the shareholders that they "are or may be entitled" to dissent. IC 23–1–44–10. However, failure to do so is not necessarily fatal; corporate action that was defectively undertaken may be ratified by subsequent action. *Galligan,* 741 N.E.2d at 1222.

A dissenting shareholder who opposes a proposed sale of all, or substantially all, of the corporate assets is entitled to dissent and obtain payment of the fair value of his shares. IC 23–1–44–8. Fair value with respect to a dissenter's shares means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects. IC 23–1–44–3.

Within ten days after corporate action is taken, the corporation must send those entitled to dissent a notice advising the dissenter where to send his demand for payment of the fair value of his shares, stating when the demand must be made, and supplying the dissenting shareholder with a form to make his demand. IC 23–1–44–12. The dissenting shareholder must then demand payment; his failure to follow the statutorily outlined steps ends the shareholder's dissenting rights. IC 23–1–44–13. On the other hand, if the shareholder properly demands payment of the fair value of his shares, the corporation must pay the corporation's estimate of "fair value" of the dissenter's shares. IC 23–1–44–15. The payment must be accompanied by a number of required documents, including, among other things, the corporation's balance sheet, income statement, statement of changes in shareholders' equity, financial statements. *Id.* A dissenting shareholder who disagrees with the valuation placed on the shares by the corporation may notify the corporation of his estimate of fair value and demand payment. IC 23–1–44–18. The shareholder must do this within thirty days after the corporation offers payment. *Id.*

### A. Meeting Notice

■ Here, on September 1, 2004, CDG issued a notice of an upcoming shareholder meeting where "sale of substantially all of the assets of the Company" was on the agenda. *Appellant's App.* at 67. The proposed sale to 345 thus triggered dissenters' rights. *See* IC 23–1–44–8. Because CDG's proposed corporate action created dissenters' rights, the notice of the meeting was required to expressly state that shareholders "are or may be entitled to

assert dissenters' rights[.]" IC 23–1–44–10. However, as Trietsch alleges in his complaint, CDG failed to follow the statutory requirements because its September 2004 notice to shareholders did not state that shareholders were entitled to assert dissenters' rights; thus, CDG's meeting notice did not comply with IC 23–1–44–10. Trietsch alleges in his complaint that because CDG failed to advise the shareholders, namely him, of his dissenters' rights, he is entitled to damages. We disagree for several reasons.

■ First, according to case law, a dissenting shareholder is limited to his dissenting shareholder rights and generally may not recover other damages. *Galligan*, 741 N.E.2d at 1225. In *Galligan*, our Supreme Court encountered similar claims made by dissenting minority shareholders. There, a majority shareholder sold corporate assets, but, in doing so, failed to comply with various aspects of Indiana law, including failing to provide the proper notice to the other four shareholders of the company. Following the sale, the corporation sent notice of a special shareholder meeting, the purpose of which included ratification of the sale of assets. The minority shareholders sued. The case was decided on summary judgment and ultimately reached the Supreme Court.

The *Galligan* Court addressed, among other things, whether a dissenting shareholder may recover damages for a corporation's noncompliance with the dissenters' rights statutes. The Court determined that while a dissenting shareholder may sue for breach of the statutory duty to provide dissenters' rights, "Damages for a breach of the statutory duty to provide dissenters' rights would presumably include any loss incurred from delay in consummating the dissenting shareholders' proceedings or otherwise occasioned by the failure to comply with the statute."

*Id.* at 1226. It continued, "If the corporation is solvent there will normally be no damages in addition to the amount recoverable by the exercise of dissenters' rights." *Id.* Here, CDG was solvent. The dissenters' rights statutes provide that Trietsch is entitled to recover the fair value of his shares in CDG. Although Trietsch disputes the fair value CDG offered him, he has identified no other loss occasioned by CDG's failure to comply with the notice requirements; accordingly, CDG is entitled to summary judgment on Trietsch's claim for damages in this regard.

■ Second, any error in CDG's September 2004 meeting notice was harmless. Trietsch appeared at the September 16 shareholder meeting and voted against the sale to 345; thus, he was aware of his right to dissent to the sale regardless of whether the notice failed to advise him of such right. *See Galligan*, 741 N.E.2d at 1224 (corporate error in failing to provide proper notice of dissenters' rights held to be harmless where shareholders were aware of their rights and served notice asserting dissenters' rights before meeting).

■ Third, in January 2005, CDG sent out a notice of an upcoming shareholder meeting that included a notice of dissenters' rights, and the agenda for the meeting included ratification of the sale of assets to 345 that occurred in September 2004. Thus, although CDG was not initially in compliance, it subsequently corrected the defective notice, thereby ratifying the sale to 345.

There are no genuine issues of material fact precluding summary judgment on Trietsch's claim for damages based on CDG's failure to comply with notice requirements. The trial court's grant of summary judgment in favor of CDG and the Directors was proper.

## B. Fair Value of Shares

■ Trietsch also claims that CDG did not meet its obligations under the dissenters' rights statutes because it failed to provide him with its estimate of fair value of Trietsch's shares and by failing to pay him the fair value of those shares. *Appellant's App.* at 45. Contrary to his assertions, CDG did both. It provided him with its estimate of fair value, on multiple occasions, and, later, it paid him for his shares.

In fact, as early as September 10, 2004, CDG informed Trietsch that it had hired Somerset to value Trietsch's shares and that, pursuant to Somerset's report, CDG's estimate of the value of Trietsch's interest in CDG was $118,000.00. Not only did CDG provide Trietsch with a copy of the Somerset report, it also invited Trietsch or his valuation expert to meet with CDG's accountant at the Somerset offices in order for Trietsch to examine the documents used to prepare the report.

Thus, it is not that CDG did not provide Trietsch with its value of his shares; it is that Trietsch did not agree with the value placed on his shares. CDG argues, and we agree, that once CDG provided Trietsch with its estimate of fair value, which it most recently did in February 8, 2005, it was Trietsch's burden to make a demand in writing of *his* estimate of fair value of his shares within thirty days. IC 23–1–44–18(b). Trietsch did not do so.

Trietsch claims that his failure to provide CDG with his estimate of fair value is because CDG did not provide him with the necessary documents to determine the fair value. IC 23–1–44–15(b)(1) identifies the following list of corporate financial documents that a company is to provide to a dissenting stockholder: the corporation's balance sheet as of the end of a fiscal year ending not more than sixteen months before the date of payment, an income state-

ment for that year, a statement of changes in shareholders' equity for that year, and the latest available interim financial statements, if any. CDG provided Trietsch with, among other things, CDG's balance sheets and profit and loss statements for the years ending June 30, 2002, 2003, and 2004, as well as the corporation's June 2004 tax asset detail and July 2004 accounts receivable summary.

■ In addition, Trietsch sought some of the Directors' personal financial records, such as tax returns and investment account statements, alleging that those documents were necessary for him to determine his shares' fair value. The trial court determined that the Directors were not required to produce their personal financial records, and we agree. Our legislature determined that which a dissenting shareholder needed in order for him to make an assessment of the fair value of his shares. That list did not include the personal financial information of the directors of the corporation.

■ We recognize that CDG did not provide Trietsch a statement of change in shareholders equity, and, consequently, did not comply fully with IC 23–1–44–15. However, Trietsch was provided with the information to readily determine the amount of shareholder equity and any change therein. The corporation's balance sheets for 2002, 2003, and 2004 clearly set forth the shareholder equity. *Appellant's App.* at 367–69. Trietsch has failed to demonstrate any prejudice in not receiving a separate record of any change in shareholder equity. Accordingly, Trietsch was not relieved of his burden to provide CDG with his estimate of the fair value of his shares. Because he did not provide CDG with that estimate, he is limited to CDG's

estimate of fair value of his shares.[4] Accordingly, the trial court's grant of summary judgment in favor of Defendants was proper on Trietsch's claim for damages.[5]

## II. Damages Related to Sale of Assets

 In Count I of his complaint, Trietsch claims that he suffered damages as a result of CDG's sale of assets to 345. In particular, he asserts that the Directors failed to take certain actions required by Indiana law. For instance, Trietsch maintains that the Directors failed to disclose that the sale to 345 was "fraught with conflicts of interest" because Rita Smith, a Director of CDG, was also a director of 345. *Appellant's App.* at 43. If Trietsch was not initially aware of Smith's role in 345, he was aware of it on or before the date of the January 2005 shareholder meeting, and any error that existed was cured. *See Galligan,* 741 N.E.2d at 1224.

 Next, Trietsch makes a challenge to the Directors' failure to recommend the sale, or explain their failure to make any recommendation, as required by IC 23–1–41–2(d), which states that for an asset sale to be authorized, the board of directors must recommend the proposed sale and the shareholders must approve. Again, the January 17, 2005 notice recommended the ratification of the September 2004 sale to 345, and the January 28, 2005 shareholder meeting approved of the sale. Any error in the initial failure to recommend the sale was cured.

These same types of claims were made by minority shareholders in *Galligan,* where the corporation sold its assets without a recommendation by its board of directors to the shareholders or any approval by the shareholders, and several minority shareholders sued and sought to recover damages. The Court held that the shareholders were precluded from recovering damages because Indiana's dissenter's rights statutes were the exclusive remedy for actions or omissions in a merger or sale of assets. *Galligan,* 741 N.E.2d at 1225–26. We, like the trial court, conclude that under the facts of this case Trietsch is precluded from recovering damages related to the underlying transaction, i.e., the sale of assets to 345. Accordingly, summary judgment was appropriate.

## III. Loan to Director

In count III of his complaint, Trietsch alleges that CDG violated IC 23–1–35–3 by

---

4. We recognize that Somerset utilized a fair market value approach, which included minority and marketability discounts, when it valued Trietsch's shares at $118,000.00 and that this court in *Wenzel v. Hopper & Galliher, P. C.,* 779 N.E.2d 30, 38 (Ind.Ct.App.2002), *trans. denied,* determined that fair market value is not necessarily the same as "fair value" for purposes of valuing a dissenting stockholder's shares. We explained in *Wenzel* that the two terms are not necessarily equivalents because the statutory term "fair value" includes the purpose that shareholders be fairly compensated, which may or may not be the same as the market's judgment about the stock's value. *Id.* There, we determined that the trial court erred when it applied minority and marketability discounts in valuing the minority shareholder's stock. *Id.* at 39–40. Here, we are not determining whether CDG's value of Trietsch's shares was the best and/or only value that could be placed on those shares. Rather, we are deciding whether summary judgment was proper, which we view as a compliance issue; we do not express any opinion on the valuation placed on Trietsch's shares.

5. This entire case and its outcome illustrate that, while the statutes are designed to achieve quick payment to a dissenting shareholder and minimize litigation, *Galligan,* 741 N.E.2d at 1225, that purpose can only be attained by timely compliance by both the corporation and the shareholder. Without that, the goal of avoiding litigation is entirely frustrated, as may be the parties engulfed in the litigation.

making an improper loan to one or more of the Directors. IC 23–1–35–3 prohibits a corporation from lending money to or guaranteeing the obligation of a director. It states in relevant part:

(a) Except as provided by subsection (c), a corporation may not lend money to or guarantee the obligation of a director of the corporation unless:

(1) the particular loan or guarantee is approved by a majority of the votes represented by the outstanding voting shares of all classes, voting as a single voting group, except the votes of shares owned by or voted under the control of the benefited director; or

(2) the corporation's board of directors determines that the loan or guarantee benefits the corporation and either approves the specific loan or guarantee or a general plan authorizing loans and guarantees.

■■■ Trietsch's claim here is that because CDG agreed to accept a promissory note as payment in the sale to 345, and the directors of CDG were the directors of 345, an improper loan was made. His claim is flawed, first, because, contrary to his allegations, all the directors of CDG were not all directors of 345. Only Rita Smith performed both as a director of CDG and of 345. Second, for a statutory violation to have occurred, the corporation must have made a loan to a director, or the corporation must have guaranteed the obligation of a director. Neither happened here. There was a promissory note given by 345 in consideration for receipt of assets from CDG; the note is payable from one corporation to the other. The trial court's grant of summary judgment to Defendants on Trietsch's claim alleging that CDG made an improper loan to one or more of the Directors was proper.

## IV. Conversion

In count IV of his complaint, Trietsch asserts a claim for conversion based upon CDG's failure to distribute retained earnings to him. He also seeks to recover treble damages, attorneys fees, interest and costs pursuant to IC 34–24–3–1. Essentially, his claim is that the Directors converted corporate earnings to their own personal benefit, by distributing cash to themselves following his termination and increasing their salaries, all of which "deprived him of the use and benefit of his share." *Appellant's Br.* at 33–35. He further complains that whatever retained earnings were not "siphoned off," were sold to 345 and he lost any ability to be repaid those sums. *Id.* at 36.

■■■ A person commits conversion when he "knowingly or intentionally exerts unauthorized control over property of another person." IC 35–43–4–3. To recover, or at least proceed, with his claim for conversion Trietsch must have had a right to distribution of retained earnings. Trietsch concedes that he possessed no such right, as there is no duty or requirement that a Subchapter S corporation distribute retained earnings. *Appellant's Br.* at 34.

■■■ Furthermore, money may be the subject of a conversion action only if it is a determinate sum that the defendant was entrusted to apply to a certain purpose. *Tobin,* 819 N.E.2d at 89. In *Tobin,* a departing minority shareholder in a law firm sued the firm and remaining partners, alleging, among other claims, that the firm's failure to pay the departing shareholder his share of retained earnings constituted conversion. The trial court granted summary judgment in favor of the shareholder on this claim, and the corporation appealed. A panel of this court determined that any wrongful withholding of retained earnings was, at most, a failure to

pay a debt, which does not constitute criminal conversion as a matter of law. *Tobin*, 819 N.E.2d at 89. Thus, we reversed summary judgment for the shareholder on his conversion claim. Similarly, in this case, Trietsch has not identified any determinate sum that should have been paid to him or that he entrusted to CDG to apply to any certain purpose, and any failure by CDG to pay Trietsch retained earnings constituted, at most, failure to pay a debt.

Trietsch's conversion claim fails as a matter of law, and summary judgment in favor of CDG and Directors was appropriate.

Affirmed.

RILEY, J., and FRIEDLANDER, J., concur.