**Peter and Lori COOK, As Parents and Next Best Friend of Lindsey Jo Cook, A Minor, Appellants–Plaintiffs,**

v.

**FORD MOTOR COMPANY, a Delaware Corporation, Appellee–Defendant.**

**No. 49A02–0802–CV–130.**

Court of Appeals of Indiana.

Sept. 21, 2009.

---

Lance Wittry, Wittry Law Office, Cheryl Planck, Indianapolis, IN, David V. Scott, New Albany, IN, Attorneys for Appellants.

Kevin C. Schiferl, Nelson D. Alexander, Frost Brown Todd LLC, Indianapolis, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

*Case Summary and Issues*

Peter and Lori Cook, as parents and next friends of Lindsey Jo Cook, filed a products liability lawsuit against Ford Motor Company following a motor vehicle accident in which eight-year-old Lindsey suffered serious brain injuries when the airbag in the Cooks' 1997 Ford F–150 pickup truck deployed and struck her in the head. The Cooks alleged that Lindsey's injuries were caused in part by Ford's defective instruction and warnings with respect to the front passenger seat airbag and airbag deactivation switch.

The trial court granted summary judgment to Ford on the Cooks' failure to warn claim, and the Cooks appeal, raising several issues that we restate as three: 1) whether the Cooks' failure to warn claim is preempted; 2) if not, whether a genuine issue of material fact exists regarding Ford's breach of its duty to warn; and 3) whether a genuine issue of material fact exists regarding Ford's breach being a proximate cause of Lindsey's injury. Ford

crossappeals the trial court's denial of its motion for fees and costs filed after a mistrial was declared, raising the issue of whether the trial court abused its discretion in failing to find the Cooks in contempt.

Concluding the Cooks' claim is not preempted by federal regulation and there is a genuine issue of material fact as to whether Ford breached its duty to warn and whether Ford was the proximate cause of Lindsey's injury, we reverse the trial court's grant of summary judgment to Ford on the Cooks' failure to warn claim and remand for further proceedings. Further concluding Ford was not entitled to fees and costs incurred during the first trial, we affirm the trial court's denial of Ford's motion for reimbursement.

### Facts and Procedural History [1]

In 1999, the Cooks purchased a used 1997 Ford truck that was placed into the stream of commerce in 1996. The truck was equipped with part-time four-wheel drive and a front side passenger airbag which could be manually disabled. Lori was to be the primary driver of the truck, but she did not read the owner's manual nor the warnings printed within the car, specifically on the sun visor. Peter looked at the owner's manual in order to understand how and when to engage the four-wheel drive. He also read page 72 of the owner's manual regarding how and when to turn off the front seat passenger airbag. Page 72 includes the following language in a colored box at the top of the page marked with an exclamation point inside a triangular symbol:

> Keep the passenger air bag turned on unless there is a rear-facing infant seat installed in the front seat. When the passenger air bag switch is turned off,

the passenger air bag will not inflate in a collision.

Appellant's Appendix at 150. Based on Peter's reading of page 72 of the manual, he believed the only reason to turn off the airbag was if a child was riding in the front passenger seat in a rear-facing child seat. Page 72 also included the following warning in a colored box:

> If the passenger air bag switch is turned off, it increases the likelihood of injury to forward facing occupants in the passenger seat.

*Id.* Peter never saw or read the following warning printed on the vehicle's sun visor:

WARNING TO AVOID SERIOUS INJURY:

- For maximum safety protection in all types of crashes, you must always wear your safety belt.

- Do not install rearward-facing child seats in any front passenger seat position, unless the air bag is off.

- Do not sit or lean unnecessarily close to the air bag.

- Do not place any objects over the air bag or between the air bag and yourself.

See the Owner's Manual for further information and explanations.

*Id.* at 97. In addition to the warning Peter read on page 72, the owner's manual also contained the following warnings and information under the heading "Seating and safety restraints":

> All occupants of the vehicle, including the driver, should always wear their safety belts.

---

**1.** We heard oral argument on June 30, 2009, at Indianapolis, Indiana. We thank counsel for their presentations.

To prevent the risk of injury, make sure children sit where they can be properly restrained.

It is extremely dangerous to ride in a cargo area, inside or outside of a vehicle.

In a collision, people riding in these areas are more likely to be seriously injured or killed. Do not allow people to ride in any area of your vehicle that is not equipped with seats and safety belts. Be sure everyone in your vehicle is in a seat and using a safety belt properly.

*Id.* at 94 (page 59 of the owner's manual; each warning is in a colored box marked with an exclamation point inside a triangular symbol);

Always follow the instruction and warnings that come with any infant or child restraint you might use.

If possible, place children in the rear seat of your vehicle. Accident statistics suggest that children are safer when properly restrained in rear seating positions than when they are restrained in front seating positions.

**Children and safety belts**

Children who are too large for child safety seats (as specified by your child safety seat manufacturer) should always wear safety belts.

Follow all the important safety restraint and air bag precautions that apply to adult passengers in your vehicle.

If the shoulder belt portion of a combination lap and shoulder belt can be positioned so it does not cross or rest in front of the child's face or neck, the child should wear the lap and shoulder belt. Moving the child closer to the center of the vehicle may help provide a good shoulder belt fit.

If the shoulder belt cannot be properly positioned:

● move the child to one of the seats with a lap belt only (if equipped)

OR

● if the child is the proper size, restrain the child in a safety seat.

*Id.* at 95 (page 75 of the owner's manual).

On April 20, 2002, the Cooks drove the truck to a friend's house in Indianapolis. Because Peter was staying to watch a basketball game, Lori moved to the driver's seat of the truck. Peter buckled Lindsey into the front passenger seat and the Cooks' two-year-old son was in a child seat in the back seat of the truck. Shortly after leaving, Lori and the children were involved in a low-speed rear-end collision. At some point prior to the collision, Lindsey had unbuckled her seat belt and was unrestrained at the time of the collision. The air bags deployed as a result of the collision and Lindsey suffered serious head trauma.

On October 23, 2002, the Cooks filed a complaint against, *inter alia*, Ford Motor Company. The complaint alleged, in relevant part, that Ford was negligent in designing several aspects of the truck. The Cooks also apparently alleged that Ford "failed to warn them of the dangers posed by the airbag to unrestrained children in the front seat of the [truck]." *Id.* at 24.[2] From February 13 to February 22, 2007,

2. This language comes from Ford's brief in support of its motion for summary judgment, citing paragraph 35 of the Cooks' first amended complaint. The complaint, in its entirety, is designated in support of the motion for summary judgment, and is alleged to be attached to the motion as Exhibit A. *See id.* at 40. Exhibit A, as included in the appendix provided to this court, consists of pages 1–6 and page 10 of the complaint. *See id.* at 44–50. Paragraph 35 is on one of the missing pages, as page 6 of the complaint ends with paragraph 32 and page 10 of the complaint picks up with paragraph 44. *See id.* at 49–50. Nonetheless, the parties do not appear to disagree about the basic substance of the Cooks' failure to warn claim.

evidence was presented to a jury on the Cooks' complaint. On February 22, 2007, Ford moved for a directed verdict and a mistrial. The trial court granted a mistrial and reset the case for jury trial on January 15, 2008. The trial court subsequently denied Ford's motion for costs incurred due to the mistrial.

On April 9, 2007, Ford filed a motion for summary judgment as to the Cooks' failure to warn claim, maintaining there was no genuine issue of material fact and it was therefore entitled to summary judgment for five reasons:

1. The alleged failure to give adequate warnings was not the proximate cause of the harm because [the Cooks] failed to read the warnings provided.

2. [The Cooks'] biomechanical expert concedes that if [the Cooks] heeded the warnings provided by Ford, Lindsey would not have sustained her injuries.

3. [The Cooks] are required to present expert testimony concerning the specific wording, content, appearance and placement of a "proper" warning, yet [the Cooks] have not retained a warnings expert.

4. [The Cooks'] state law failure-to-warn claim is impliedly pre-empted by federal regulation governing airbag warnings, 49 C.F.R. § 571.208.

5. Compliance with the applicable federal regulation gives rise to a presumption under state law that the product was not defective and that the defendant was not negligent.

*Id.* at 24–25. Following a hearing, the trial court entered an order granting summary judgment for Ford on the Cooks' failure to warn claim. After additional proceedings not relevant to this appeal,[3] the trial court issued an Entry of Final Judgment on January 16, 2008. The Cooks now appeal the trial court's grant of summary judgment to Ford on their failure to warn claim; Ford cross-appeals the trial court's denial of its motion for costs following the mistrial.

### *Discussion and Decision*

#### I. The Cooks' Appeal

##### A. Summary Judgment Standard of Review

Summary judgment is appropriate only when the designated evidence "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). "A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue." *Scott v. Bodor, Inc.*, 571 N.E.2d 313, 318 (Ind.Ct. App.1991).

We review the grant or denial of a motion for summary judgment *de novo.*

---

**3.** After entry of summary judgment on the failure to warn claim, the case remained set for jury trial on January 15, 2008, on the Cooks' design defect claims. At a pre-trial conference on December 17, 2007, the trial court considered Ford's motion in limine relating to whether the Cooks could pursue their claims of design defects in the air bag inflation system. The trial court heard argument and reviewed the transcript of the first trial and thereafter ordered that the Cooks show cause as to whether they had any expert evidentiary basis for their claims. At the show cause hearing, the trial court determined there was insufficient evidence to allow the Cooks to pursue their claims of design defects in the airbag inflation system and granted Ford's oral motion for summary judgment as to those claims. The Cooks subsequently withdrew their only remaining claim—a design defect in the magnetic bias in the air bag sensor system—and the trial court entered final judgment.

*Univ. of S. Ind. Found. v. Baker,* 843 N.E.2d 528, 531 (Ind.2006). We examine only those materials properly designated by the parties to the trial court. *Trietsch v. Circle Design Group, Inc.,* 868 N.E.2d 812, 817 (Ind.Ct.App.2007). We construe all facts and reasonable inferences drawn from them in favor of the non-moving party, *Am. Home Assurance Co. v. Allen,* 814 N.E.2d 662, 666 (Ind.Ct.App.2004), *trans. dismissed,* and resolve all doubts as to the existence of a material issue against the moving party, *Tibbs v. Huber, Hunt & Nichols, Inc.,* 668 N.E.2d 248, 249 (Ind. 1996). The movant has the initial burden of proving the absence of a genuine issue of material fact as to an outcome determinative issue and only then must the non-movant come forward with evidence demonstrating the existence of genuine factual issues which should be resolved at trial. *Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.,* 644 N.E.2d 118, 123 (Ind.1994).

The party appealing the trial court's summary judgment decision has the burden of persuading us that the decision was erroneous. *Owens Corning Fiberglass Corp. v. Cobb,* 754 N.E.2d 905, 908 (Ind. 2001). If the trial court's grant of summary judgment can be sustained on any theory or basis in the record, we will affirm. *Beck v. City of Evansville,* 842 N.E.2d 856, 860 (Ind.Ct.App.2006), *trans. denied.*

### B. Failure to Warn Claim

#### 1. Background

■■■ Indiana's Product Liability Act (the "Act") governs all actions that are brought by a user or consumer against a manufacturer or seller for physical harm caused by a product regardless of the substantive theory or theories upon which the action is brought.[4] Ind.Code § 34–20–1–1; *Stegemoller v. ACandS, Inc.,* 767 N.E.2d 974, 975 (Ind.2002). A product may be defective within the meaning of the Act because of a manufacturing flaw, a design defect, or a failure to warn of dangers in the product's use. *Baker v. Heye–America,* 799 N.E.2d 1135, 1140 (Ind.Ct.App. 2003), *trans. denied.* The duty to warn is twofold: 1) to provide adequate instructions for safe use, and 2) to provide a warning as to dangers inherent in improper use. *Rushford,* 868 N.E.2d at 810. "[I]n an action based on . . . an alleged failure to provide adequate warnings or instructions regarding the use of the product, the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in . . . providing the warnings or instructions." Ind.Code § 34–20–2–2. Although the adequacy of warnings, which implicates a breach of duty, is generally a question of fact for the trier of fact to resolve, the nature of the duty to provide warnings is a question of law to be decided by the court. *Rushford,* 868 N.E.2d at 810.

■■■ Cases alleging a failure to adequately warn under the Act sound in negligence. *Ford Motor Co. v. Rushford,* 845 N.E.2d 197, 200 (Ind.Ct.App.2006), *aff'd in relevant part,* 868 N.E.2d 806, 809 (Ind. 2007). Negligence has three elements: 1)

---

**4.** As noted in footnote 2, we do not have in the record before us the pages of the complaint on which the Cooks' failure to warn claim was made and therefore do not know whether it was brought in strict liability or negligence. The following principles apply regardless of which theory was advanced, however. *See Ford Motor Co. v. Rushford,* 868 N.E.2d 806, 810 (Ind.2007) ("Under either [strict liability or negligence] a product may be defective under the Act where the manufacturer fails in its duty to warn of a danger or instruct on the proper use of the product as to which the average consumer would not be aware.").

a duty owed by the defendant to the plaintiff, 2) a breach of that duty, and 3) injury to the plaintiff proximately caused by the defendant's breach. *Rhodes v. Wright,* 805 N.E.2d 382, 385 (Ind.2004). Summary judgment is rarely appropriate in negligence cases "because negligence cases are particularly fact sensitive and are governed by a standard of the objective reasonable person—one best applied by a jury after hearing all of the evidence." *Id.* at 387. Nonetheless, a defendant is entitled to judgment as a matter of law when the undisputed material facts negate at least one element of the plaintiff's claim. *Id.* at 385.

## 2. Preemption

We address first Ford's contention that the Cooks' failure to warn claim is pre-empted by federal law. The preemption doctrine is grounded in the Supremacy Clause of Article VI of the United States Constitution, which establishes federal law as the supreme law of the land. *Roland v. General Motors Corp.,* 881 N.E.2d 722, 725 (Ind.Ct.App.2008), *trans. denied.* Administrative regulations promulgated pursuant to congressional authorization have the same preemptive effect as federal statutes. *Rogers ex rel. Rogers v. Cosco, Inc.,* 737 N.E.2d 1158, 1163–64 (Ind.Ct.App.2000), *trans. denied.* State law is preempted only when that is the clear intent of Congress in enacting the federal statute at issue. *Id.* at 1164. Preemption may be either express or implied, "and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 738, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985).

The National Traffic and Motor Vehicle Safety Act (the "Safety Act") was enacted to "reduce traffic accidents and death and injuries to persons resulting from traffic accidents." 49 U.S.C. § 30101. The Safety Act contains the following preemption clause:

> When a motor vehicle safety standard is in effect under this chapter, a State or a political subdivision of the State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter.

49 U.S.C. § 30103(b)(1). The Safety Act also contains a state common law savings clause, however, stating that "[c]ompliance with a motor vehicle safety standard under this chapter does not exempt a person from liability at common law." 49 U.S.C. § 30103(e). Reading the preemption clause and the savings clause together, common law tort actions are not expressly preempted. *Geier v. American Honda Motor Co., Inc.,* 529 U.S. 861, 868, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). The savings clause "preserves those actions that seek to establish a greater safety than the minimum safety achieved by a federal regulation intended to provide a floor." *Id.* at 870. The savings clause "does not bar the ordinary working of conflict pre-emption principles," however. *Id.* at 869. State law tort actions may be preempted if the state standards in question actually conflict with federal objectives. *Id.* at 874 (citing *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941) ("Our primary function is to determine whether, under the circumstances of this particular case, [the state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.")). There is a general presumption against preemption because respect for the States as "independent sovereigns in our

federal system" leads courts to assume that "Congress does not cavalierly preempt state-law causes of action." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). When the text of a preemption clause is susceptible of more than one plausible interpretation, courts ordinarily accept the interpretation that disfavors preemption. *Bates v. Dow Agrosciences, LLC,* 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005).

The National Highway Traffic Safety Administration was charged with developing and promulgating federal motor vehicle safety standards under the Safety Act. 49 C.F.R. § 1.50(a). On summary judgment, Ford contended that one of these safety standards specifies the airbag warnings to be used by automobile manufacturers and preempted the Cooks' claim. *See* 49 C.F.R. § 571.208 ("Standard 208"). In its motion for summary judgment, Ford cited generally Standard 208, but argued specifically that the visor warning was mandated. *See* Appellant's App. at 26 ("The *visor warning* contained the following language as mandated by [Standard] 208 . . . .") (emphasis added); at 27 (reproducing the visor warning from the Cooks' truck); at 35 (stating that Standard 208 was amended on September 2, 1993 "to require specified *in-car* warnings") (emphasis added); at 35–36 (describing "NHTSA's express purpose in mandating a specific, exclusive *airbag warning label,*" and referencing NHTSA's agency decision regarding labels, 58 Fed.Reg. 46551 (Sept. 2, 1993)). Standard 208, as applicable to the Cooks' truck, provided for a specific sun visor label:

(b) Label on sun visor above front outboard seating positions equipped with inflatable restraint.

(1) Each vehicle manufactured on or after September 1, 1994, shall comply with either S4.5.1(b)(1)(i) or S4.5.1(b)(1)(ii),

except that the word "WARNING" may be used instead of "CAUTION".
* * *

(ii) If the vehicle is equipped with a cutoff device permitted by S4.5.4 of this standard, each front outboard seating position that provides an inflatable restraint shall have a label permanently affixed to the sun visor for such seating position on either side of the sun visor, at the manufacturer's option. Except as provided in S4.5.1(b)(1), this label shall read:

CAUTION

TO AVOID SERIOUS INJURY:

For maximum safety protection in all types of crashes, you must always wear your safety belt.

Do not install rearward-facing child seats in any front passenger seat position, unless the air bag is off.

Do not sit or lean unnecessarily close to the air bag.

Do not place any objects over the air bag or between the air bag and yourself.

See the owner's manual for further information and explanations.

49 C.F.R. § 571.208 S4.5.1(b)(1) (Oct. 1, 1996). The Cooks did not dispute on summary judgment that the visor warning in their truck said what it was required by federal law to say. *See Fisher v. Ford Motor Co.,* 224 F.3d 570, 574 (6th Cir.2000) (holding that the visor warning language is both a floor and a ceiling as the sole language NHTSA wanted for in-car warnings to avoid "information overload" and a state law claim that would impose a duty to warn by means of additional and different in-car warnings was therefore preempted). The Cooks' concern is with the instruction in the owner's manual that the passenger side air bag should be

turned on "unless there is a rear-facing infant seat installed in the front seat."

■■■ On appeal, Ford, still relying generally on Standard 208, now cites specifically to S.4.5.4.4, which provides:

The vehicle owner's manual shall provide in a readily understandable format:

(a) Complete instructions on the operation of the cutoff device;

(b) A statement that the [airbag] cutoff device should only be used when a rear-facing infant restraint is installed in the front passenger seating position; and

(c) A warning about the safety consequences of using the cutoff device at other times.

49 C.F.R. § 571.208 S4.5.4.4. The Cooks argue waiver for purposes of this appeal and urge us to impose the "law of the case" doctrine to prohibit Ford from raising S.4.5.4.4 to the trial court in the event of a remand. *See* Reply Brief of Appellant and Brief of Cross Appellee at 7–13. We

note two things with respect to waiver: 1) Ford cited Standard 208 generally to the trial court; and 2) we may affirm a grant of summary judgment on any basis supported by the record,[5] *Beck,* 842 N.E.2d at 860.[6] Whether the provisions of Standard 208 preempt the Cooks' failure to warn claim was an issue raised to the trial court and is a question of law that can be decided on this record.

Several recent United States Supreme Court preemption cases are relevant to our decision. As discussed above, the Supreme Court held in *Geier* that the Safety Act's preemption provision did not expressly preempt common law tort actions notwithstanding a manufacturer's compliance with federal standards, but also held that the savings clause did not foreclose operation of ordinary preemption principles on those actions. 529 U.S. at 868–69, 120 S.Ct. 1913. Applying those holdings to an injured motorist's design defect action against a car manufacturer alleging negligence in failing to equip her car with

---

**5.** Although it is often said that a party may not raise an issue for the first time on appeal, *see* Troxel v. Troxel, 737 N.E.2d 745, 752 (Ind.2000), because we can affirm a grant of summary judgment on any ground supported by the record—not just on those grounds argued by the parties—the appellee is not necessarily subject to this rule of issue preservation/waiver on our review of summary judgment proceedings. This is unlike the situation presented in *Paramo v. Edwards,* 563 N.E.2d 595, 600 (Ind.1990), wherein our supreme court held that the appellee had waived the issue of whether an affidavit contained conclusory allegations that should not have been considered in determining whether summary judgment was appropriate by not objecting to the offending affidavit in the trial court despite the appellee's argument that the court was bound to affirm the grant of summary judgment on any theory or basis found in the record. "Waiver will result if timely objection to documents or exhibits is not raised at the trial court. We therefore conclude that, while trial court consideration of conclusory state-

ments or matters in affidavits otherwise inadequate under T.R. 56(E) would constitute error, the [appellee's] failure to raise a timely objection constitutes waiver of such claim of error." *Id.* (citations omitted). Here, Ford is not raising an issue omitted before the trial court. Rather, Standard 208 was cited to the trial court as applicable law.

**6.** With respect to the Cooks' request that we prohibit consideration of S4.5.4.4 in any further proceedings, we also note that the trial court's grant of a mistrial and order for a new trial resets the case. *See United States v. Ayres,* 76 U.S. (9 Wall.) 608, 610, 19 L.Ed. 625; 19 L.Ed. 627 (1869) ("[T]he order granting the new trial has the effect of vacating the former judgment, and to render it null and void, and the parties are left in the same situation as if no trial had ever taken place in the cause. This is the legal effect of the new trial by a court competent to grant it."). However, our resolution of the preemption issue herein will be binding on the parties and the trial court in subsequent proceedings.

a driver's side airbag, the Court held that the specific action was preempted because it actually conflicted with Standard 208. *Id.* at 874, 120 S.Ct. 1913. Standard 208 as applicable to the plaintiff's 1987 vehicle required manufacturers to equip some but not all of their 1987 vehicles with passive restraints and did not mandate the type of passive restraint to be installed. The standard "deliberately sought variety—a mix of several different passive restraint systems" and "also deliberately sought a *gradual* phase-in of passive restraints." *Id.* at 878–79, 120 S.Ct. 1913. Moreover, the standard was conditional, providing for recission if, by September 1, 1989, two-thirds of the states had laws in place requiring seatbelt use. Because the standard specifically gave manufacturers an option in the type of passive restraint system to install and required only 10% of the 1987 fleet be so equipped, plaintiff's action that would have imposed a duty to install an airbag "stood as an obstacle to the accomplishment and execution of the important ... federal objectives" and was therefore preempted. *Id.* at 881, 120 S.Ct. 1913 (quotation omitted);[7] *see also Riegel v. Medtronic, Inc.*, 552 U.S. 312, 128 S.Ct. 999, 1007–08, 169 L.Ed.2d 892 (2008) (holding that the Medical Device Amendments to the Food, Drug, and Cosmetic Act

("FDCA") expressly preempted state "requirements"—including common law actions for negligence and strict liability—that are different from or in addition to the federal requirements for a medical device that was given premarket approval by the FDA); *Hurley v. Motor Coach Indus., Inc.*, 222 F.3d 377, 383 (7th Cir.2000) (holding that because Standard 208 offers manufacturers a choice as to driver protection systems installed in buses, plaintiff's state law claim that would foreclose one or more of those choices is preempted), *cert. denied*, 531 U.S. 1148, 121 S.Ct. 1087, 148 L.Ed.2d 962 (2001).

More recently, in *Altria Group, Inc. v. Good*, —— U.S. ——, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008), the Court held that a state action by cigarette smokers against tobacco products manufacturers alleging claims that cigarettes were "light" and had "lowered tar and nicotine" was not expressly preempted by the Federal Cigarette Labeling and Advertising Act ("FCLAA"). The FCLAA's stated purposes are "to establish a comprehensive Federal program to deal with cigarette labeling and advertising" by adequately informing the public that cigarette smoking may be hazardous to health and to not impede commerce "by diverse, nonuni-

**7.** In so deciding, the Court "place[d] some weight upon DOT's interpretation of [Standard] 208's objectives and its conclusion, as set forth in the Government's brief, that a tort suit such as this one would 'stand as an obstacle to the accomplishment and execution' of those objectives." *Id.* at 883. Because Congress had delegated to DOT authority to implement the statute, the subject matter is technical, and the relevant history and background are complex and extensive, "the agency's own views should make a difference." *Id.* On May 20, 2009, President Obama issued a "Memorandum for the Heads of Executive Departments and Agencies" stating that "the general policy of my Administration [is] that preemption of State law by executive departments and agencies

should be undertaken only with full consideration of the legitimate prerogatives of the States and with a sufficient legal basis for preemption." Heads of departments and agencies were directed not to include in regulatory preambles "statements that the department or agency intends to preempt State law through the regulation except where preemption provisions are also included in the codified regulation"; and not to include "preemption provisions in codified regulations except where such provisions would be justified under legal principles governing preemption." Memorandum for the Heads of Executive Departments and Agencies re: Preemption, May 20, 2009, available at www.whitehouse.gov/the_press_office/ Presidential–Memorandum–Regarding–Preemption/.

form, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health." 15 U.S.C. § 1331. To this end, the FCLAA has two express preemption provisions: 1) prohibiting the requirement of additional statements relating to smoking and health on cigarette packages, 15 U.S.C. § 1334(a); and 2) providing that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter," 15 U.S.C. § 1334(b). Construing the phrase "based on smoking and health" "fairly but narrowly," the Court held that the plaintiffs' action arising from a state statutory duty not to deceive did not seek to impose a prohibition "based on smoking and health" and was not therefore expressly preempted. 129 S.Ct. at 549.

Finally, in *Wyeth v. Levine,* —— U.S. ——, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009), the Court held that a state law claim of failure to warn of a specific risk associated with a prescription drug was not preempted. The plaintiff had received an injection of a drug via a method that resulted in gangrene and amputation of her arm. The drug and its warning label had been approved by the FDA pursuant to the FDCA. The plaintiff argued that the manufacturer should have strengthened the approved warning to warn of the risks of administering the drug by that method. The manufacturer argued that it would have been impossible to comply with the state law duty sought to be imposed by the plaintiff to modify the drug warning label and also with its federal labeling duties. The Court held that because a regulation allows a manufacturer to change an approved label to add or strengthen a warning immediately upon filing a supplemental application for the change and without

waiting for FDA approval, the manufacturer failed to prove the "demanding defense" of impossibility preemption. *Id.* at 1199. The manufacturer also argued that requiring it to comply with a state law duty to provide a stronger warning would obstruct the purposes and objectives of federal drug labeling regulation. The manufacturer argued that the FDCA "establishes both a floor and ceiling ...:[o]nce the FDA has approved a drug's label, a state-law verdict may not deem the label inadequate...." *Id.* However, the absence of an express preemption provision in the FDCA for prescription drugs "is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness." *Id.* at 1200. The FDA's declaration in the preamble to a 2006 regulation governing the content and format of drug labels that the FDCA establishes a floor and a ceiling and that state law failure to warn claims threaten the FDA's statutorily prescribed role as the "expert Federal agency responsible for evaluating and regulating drugs," *id.,* did not merit deference because it was not offered for comment before being finalized, because it was at odds with evidence of Congress' purpose, and because it reversed the FDA's longstanding position that federal labeling standards were a floor only, *id.* at 1201–02.

 At first glance, this case might seem to be controlled by the outcome in *Geier,* as both *Geier* and this case concern automobile safety through airbags and the application of Standard 208. However, the specific regulations at issue are sufficiently different that we do not believe the fact the action in *Geier* was preempted dictates the same result in this case. In *Geier,* the standard gave manufacturers options from which to choose and a period of time over which to comply; the plaintiff's suit would have foreclosed the options and accelerat-

ed the timeline and therefore impermissibly conflicted with the standard. Here, the standard requires an airbag warning to be included in the owner's manual but describes only generally the content that should be covered by the warning; the Cooks' claim that the airbag warnings should have been worded differently in no way conflicts with the standard. When Standard 208 was amended to address front passenger airbags, children, and cutoff devices, NHTSA specifically declined to establish the precise language that must appear in the owner's manual. *See* 60 Fed.Reg. 27233, 27237 (May 23, 1995) ("NHTSA also proposed to require that manufacturers include information concerning the cutoff device in the owner's manual. NHTSA did not propose specific language which must be included in the owner's manual."); 58 Fed.Reg. 46551, 46557 (Sept. 2, 1993) ("NHTSA noted that it was not proposing to establish the precise language that must appear in the owner's manual. Instead, under the proposal, manufacturers were to be required to provide this information in their owner's manuals, and allowed to choose the language they believe would most effectively convey the information to readers of the owner's manual.... The agency further believes that providing manufacturers flexibility in choosing the language will result in more effective messages that are tailored for individual vehicles. Therefore, the agency is not providing more specific requirements concerning the information that must be provided."). The points addressed in S4.5.4.4 must be included in the owner's manual, but the specific language is not mandated and additional points are not foreclosed. Therefore, contrary to Ford's position, we believe that S4.5.4.4 provides a floor for the warnings to be included in an owner's manual with respect to airbag safety and the use of the cutoff device but not a ceiling.

We believe this case and the applicable federal standard is more akin to *Wyeth,* even though the regulatory schemes to which *Wyeth* and this case are subject are different. Like the plaintiff in *Wyeth,* the Cooks argue Ford should have strengthened its warnings; like the manufacturer in *Wyeth,* Ford argues that it would be impossible to do so and remain in compliance with the federal standard. The warning in *Wyeth* was approved by a federal agency, but there was a process by which it could be changed at the manufacturer's request; here, the warning did not even require pre-approval and was left to the manufacturer's discretion. In *Wyeth,* the Court found no preemption despite the implementing agency's assertions that the suit was preempted because the regulations at issue were both a floor and a ceiling; here, the implementing agency's comments, if not outright stating that the standard is a floor only, strongly imply that such is the case by allowing the manufacturers flexibility to tailor the warning language to their vehicles. Ford has not shown as a matter of law that it would be impossible for it to comply with both Standard 208 and the state law duty the Cooks seek to impose; nor has Ford shown that a stronger or differently-worded warning would obstruct the purposes and objectives of the Safety Act's regulation of automobile manufacturing in order to "reduce traffic accidents and death and injuries to persons resulting from traffic accidents." 49 U.S.C. § 30101. For many of the same reasons *Wyeth* found no preemption and for several additional reasons as outlined above, we hold that the duty the Cooks seek to impose neither actually conflicts with Standard 208 nor stands as an obstacle to the accomplishment and execution of federal objectives regarding airbag warnings. Therefore, preemption was not a

basis on which to grant summary judgment to Ford.

### 3. Adequacy of Warnings

 The Cooks contend that the trial court erred in granting summary judgment to Ford because there is a genuine issue of material fact as to whether the owner's manual instructions regarding airbag deactivation were defective[8] and whether the defective instruction was a proximate cause of Lindsey's injury.

#### a. Breach of Duty

 There can be no doubt that Ford owed a duty to warn the Cooks of the dangers associated with the truck's airbags. As stated above, the duty to warn consists of two duties: 1) to provide adequate instructions for safe use; and 2) to provide a warning as to dangers inherent in improper use. *Rushford*, 845 N.E.2d at 201. The Cooks contend that the airbag warning on page 72 of the owner's manual that the airbag should be on "unless there is a rear-facing infant seat installed in the front seat" and that turning the passenger airbag off "increases the likelihood of injury to forward facing occupants in the passenger seat" breaches Ford's duty to provide adequate instructions for safe use. Expert testimony designated on summary judgment indicates that airbags pose a danger to all children in the front passenger seat, not just those in a rear-facing child seat. *See* Appellant's App. at 170 (Testimony of Dr. Carley Ward: "So children are always at risk in the front seat of a vehicle unless they've got the seat all the way back and a pretentioner on the belt. . . . Unless you give the instruction to the parent to do that, you should have the bag turned off"). Testimony from a Ford engineer indicated that Ford knew airbags were dangerous to children in the mid-1990s and that implementation of the deactivation switch was done in part to help prevent injuries to children as a result of passenger airbag deployment. *See id.* at 157. Peter testified that his understanding of the proper use of the airbag deactivation switch was that it should be used *only* when a rear-facing child seat was in the front passenger seat and that the warnings he read—even those he read after the fact—did not clearly impart to him the dangers airbags posed to all children in the front seat. Peter testified that even if he had read the instruction that children should be placed in the rear seat of the vehicle if possible and that "[a]ccident statistics suggest that children are safer when properly restrained in rear seating positions than when they are restrained in front seating positions," he would not have altered his conduct because nothing about the instructions contradicted his belief that the presence of the airbag provided great-

---

8. Ford contends that the Cooks' admitted failure to read the entire owner's manual defeats their claim. It is true that "[w]here warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." *Dias v. Daisy–Heddon*, 180 Ind.App. 657, 662, 390 N.E.2d 222, 225 (1979) (quoting Restatement of Torts (2d) section 402A, comment j (1976)). In Indiana, there is a presumption that an adequate warning would have been read and heeded. *Id.* However, the Cooks contend that even if they had read all the instructions pointed to by Ford, the instructions as a whole were inadequate to inform them of the dangers airbags pose to children other than those in rear-facing child seats. Their failure to read all instructions is not fatal to their claim that the instructions were inadequate to begin with. *Cf. Rushford*, 845 N.E.2d at 202 (holding, with respect to claim that Ford failed to provide notice of the airbag warning in the owner's manual, that "Ford has shown that there is not a genuine issue of material fact regarding whether Ford discharged its duty to warn when it provided Rushford with warnings that Rushford concedes were adequate").

er protection in the front seat. *See id.* at 134.

Whether a particular act or omission is a breach of duty is generally a question of fact for the jury, but can be a question of law when the facts are undisputed and only a single inference can be drawn from those facts. *Rushford,* 845 N.E.2d at 202. Given the wording of the airbag instructions in the owner's manual that a passenger airbag should remain on except in the one specific instance of a rear-facing child seat in the passenger seat and the expert testimony designated to the trial court that a passenger airbag poses a risk to all children and should be turned off when any child is in the passenger seat, we cannot say as a matter of law that the instructions were adequate. Even if we presume the Cooks read and heeded all the airbag instructions provided by Ford, there is a question of fact as to whether a reasonable person would have understood from Ford's instructions that injury could occur under these circumstances.[9] The dissent believes that because it is undisputed the Cooks failed to comply with instructions to place children in the backseat and to wear seat belts, Ford has not, as a matter of law, breached its duty to warn.[10] We agree it is undisputed that the owner's manual instructed to place children in the backseat "if possible," and that there was room for Lindsey in the backseat of the Cooks' truck on the day of the accident. We also agree it is undisputed that the owner's manual stated that all

---

9. Ford argued to the trial court on summary judgment that the Cooks' failure to designate expert testimony regarding an alternate warning was fatal to their claim. Our supreme court has held that "supporting and opposing evidence relevant to a determination of what a proper warning should state ... is indispensable to a rational conclusion that the product was defective and unreasonably dangerous to the user without warnings, and to a rational conclusion that such unreasonably dangerous condition was the proximate cause of the accident and injury." *Morgen v. Ford Motor Co.,* 797 N.E.2d 1146, 1152 (Ind.2003) (quoting *Nissen Trampoline Co. v. Terre Haute First Nat'l Bank,* 265 Ind. 457, 463–64, 358 N.E.2d 974, 978 (1976) (emphasis omitted)). The court was addressing the trial court's refusal to read plaintiff's tendered instructions regarding Ford's duty to warn of product dangers. Holding first that the instructions were covered by instructions that were given, *id.* at 1151, the court also held that there was not sufficient evidence in the record to support the tendered instructions because there was "no testimony or evidence ... on the content or placement of a warning that would have prevented the danger posed by the alleged defect.... Without this evidence we are left to hypothesize as to what specific warnings would have made the [vehicle] reasonably safe [and w]e will not find the trial court's instructions inadequate without more," *id.* at 1152. Although evidence of an alternate adequate warning may be required, an expert is not necessarily the sole source of such evidence. *See Cansler v. Mills,* 765 N.E.2d 698, 706 (Ind.Ct.App.2002) ("In order to justify dismissing a case because the plaintiff has failed to present expert testimony, a court must find that the facts necessary to establish a prima facie case cannot be presented to any reasonably informed factfinder without the assistance of expert testimony."), *trans. denied;* Tr. at 1256 (trial court stating, "I know there's caselaw that you have to give an alternate warning, but ... this doesn't seem like anything that would take an expert to do."). There was testimony at the first trial that if the owner's manual had stated that airbags pose a danger to all children, not just those in a rear-facing child seat, or that airbags do not make the front seat safer than the backseat, the Cooks would not have placed Lindsay in the front seat or would not have left the airbag on.

10. The case cited by the dissent, *In re Air Bag Products Liability Litigation,* 7 F.Supp.2d 792 (E.D.La.1998) does discuss a Ford instruction to put children in the rear seat when possible. However, that case concerned a claim that the force and speed of airbag deployment was a latent design defect rather than making a claim regarding the warning itself, *id.* at 795, and we therefore find it distinguishable from the case at bar.

vehicle occupants "should" wear their seat belts, but note that when Peter put Lindsey in the front seat, he secured her seat belt.[11] However, we have already concluded that Standard 208 does not preempt the Cooks' claim because the standard leaves the specific language of the warning up to the manufacturer. In this case, the language selected by Ford with respect to the additional warnings was permissive; that is, it equivocally instructed to place children in the backseat "if possible," "suggested" that children are safer there, and that occupants "should" always wear seat belts. Moreover, the warning fails to state that one of the risks from which children are possibly safer is injury from deployment of the front seat passenger airbag. Even if the Cooks had read all the warnings in the owner's manual, the permissive nature of the warnings would not have changed their conduct. See Tr. at 134. In short, Standard 208 allows Ford discretion in crafting a warning and we believe there is at least a question of fact as to whether Ford exercised that discretion in crafting a warning that was strong and specific enough to warn the Cooks that the additional instructions were linked to danger from the airbag. Thus, we hold Ford was not entitled to summary judgment on the issue of breach of its duty to warn.

### b. Proximate Cause

 A party's act is the proximate cause of an injury if it is "the natural and probable consequence of the act and should have been reasonably foreseen and anticipated in light of the circumstances." *Hassan v. Begley*, 836 N.E.2d 303, 307 (Ind.Ct.App.2005). In other words, proximate cause requires, at a minimum, that the harm would not have occurred but for the defendant's conduct. *Id.* "It is not

necessary for a defendant's act or omission to be *the* proximate cause of the plaintiff's injury, so long as the conduct is a proximate cause of the injury." *Id.* (emphasis in original); *see* Ind.Code §§ 34–51–2–1 et seq. (Indiana's Comparative Fault Act, apportioning liability among those whose fault caused or contributed to the loss in proportion to their percentages of "fault"). Proximate cause is primarily a question of fact to be determined by the jury and therefore, ordinarily is not properly resolved on summary judgment. *Sparks v. White*, 899 N.E.2d 21, 29 (Ind.Ct.App. 2008).

 The Cooks contend that Lindsey's injury would not have occurred but for the airbag instruction failing to adequately instruct them to deactivate the airbag for all child passengers and/or to specifically warn of the dangers of airbags to children. Ford contends that the airbag instructions are not the proximate cause of the Cooks' injuries, because if the Cooks had heeded the instructions to place children in the backseat and to remain belted at all times, Lindsey's injuries would not have occurred and/or would not have been as severe. Peter's designated testimony is that he belted Lindsey into the front passenger seat when he placed her in the car; that he believed the front seat, equipped with an airbag, was actually safer for her than the back seat; and that had the airbag instruction warned of the dangers of airbag deployment to all children, he would have deactivated it or not seated her in the front seat.

As for Ford's seatbelt assertion, there is no dispute that Lindsey would not have been injured as severely if she had been belted at the time of the accident. *See* Appellant's App. at 64 (in response to

---

11. As we discuss below, whether Lindsey unbelting herself in the moments before the ac-

cident is an intervening cause is a question of fact. *See infra* Section I.B.3.b.

question, "And do you agree that if Lindsey had had her seat belt on, that she wouldn't have been injured by the airbag door," Lori answered, "Yes."); *but see id.* at 54 (response to request for admission that "Lindsey's injuries would have been less severe in the Accident if she had been wearing a seat belt at the time of the Accident": "Plaintiff admits that Lindsey Cook may not have suffered the same injury if a seatbelt had restrained her closer to the seatback, but Plaintiff affirmatively alleges that substantial injury is caused by Ford airbag deployments in below threshold crashes...."). However, there is also no dispute that Peter belted Lindsey into the truck and that Lindsey subsequently unbelted herself. There is designated evidence that Lindsey had periodically unbelted herself on previous occasions and that she was immediately instructed to rebuckle her seatbelt on those occasions. There is no designated evidence indicating how long Lindsey had been unbelted before the accident occurred.

 ▮▮▮ Lindsey was eight years old at the time of the accident. Children between the ages of seven and fourteen are required to exercise due care for their own safety under the circumstances of a child of like age, knowledge, judgment, and experience and there is a rebuttable presumption they are incapable of negligence.[12] *Creasy v. Rusk,* 730 N.E.2d 659,

662 (Ind.2000). Reasonably foreseeable intervening acts do not break the chain of causation and the original wrongful act can still be the proximate cause of an injury. *Briesacher v. Specialized Restoration and Constr., Inc.,* 888 N.E.2d 188, 194 (Ind.Ct. App.2008); *see Conder v. Hull Lift Truck, Inc.,* 435 N.E.2d 10, 14 (Ind.1982) (the action of someone or something other than the alleged tortfeasor that affects the chain of causation is an intervening cause; it becomes a superseding cause breaking the chain of causation if it was not forseeable). As the trial court noted, there is no dispute that Peter and Lori followed the seat belt instruction when placing Lindsey in the front seat. *See* Tr. at 1698 (the trial court, at summary judgment hearing: "[T]he evidence that's in the record is that [Lindsey] immediate [sic]—she unbuckled herself split seconds before mom had any awareness of it. So mom followed the instructions, dad followed the instructions on seatbelts...."). Because a child of Lindsey's age is rebuttably presumed incapable of negligence, whether Lindsey failed to exercise the due care required of her for her own safety under these circumstances and, if so, whether her failure was an intervening cause[13] sufficient to break any chain of causation leading back to Ford is, at best, a question of fact for the jury.[14] *See Control Techniques, Inc. v.*

12. Although *Creasy* used the phrase "contributory negligence" in describing the Indiana standard for determining liability of children for their alleged tortious acts, *Creasy* actually arose in the context of a comparative fault case. *See Creasy v. Rusk,* 696 N.E.2d 442, 444 (Ind.Ct.App.1998). There is no indication that the standard is different based upon whether the action is one alleging contributory negligence or comparative fault, Ind.Code §§ 34–51–2 et seq. (effective in 1985), on the part of the child.

13. We do note that an intervening cause need not be negligence or fault on the part of

another. *See Collins v. J.A. House, Inc.,* 705 N.E.2d 568, 573 (Ind.Ct.App.1999) (contractor who left pipe on second floor of building under construction could not have reasonably foreseen that a gust of wind would inflate sheet of visqueen attached to outside scaffolding, cause boards to fall onto the scaffold, and necessitate worker on scaffold to jump through second story window into building; therefore, contractor was not liable for injury caused to worker by pipe), *trans. denied.*

14. Also, given Lindsey's age at the time of the accident, the more relevant question may be whether Lori's conduct in not noticing that

*Johnson,* 762 N.E.2d 104, 107 (Ind.2002) (whether or not an intervening cause is forseeable "such that liability may be imposed on the original wrongdoer is a question for a jury."); *see also Morgen,* 797 N.E.2d at 1149–50 (collecting cases holding that it is proper for the jury to decide whether failure to use a seatbelt is misuse); *Underly v. Advance Mach. Co.,* 605 N.E.2d 1186, 1189 (Ind.Ct.App.1993) ("The foreseeability of an intervening misuse is usually a question for the jury."), *trans. denied; cf. Bowman v. State,* 564 N.E.2d 309, 313 (Ind.Ct.App.1990), *aff'd in relevant part,* 577 N.E.2d 569, 571 (Ind.1991) ("[I]t is clearly forseeable that an automobile passenger might fail to wear a seatbelt.").[15]

As to Ford's assertion regarding the instruction to place children in the backseat, there is no dispute that Lindsey's injury would not have occurred if she had been in the backseat. *See* Appellant's App. at 62–63 (in response to question, "And you'd agree that if Lindsey had been in the backseat when this crash occurred, she'd be perfectly fine," Lori answered, "Yes."). However, the Cooks' claim is that the backseat instruction is less than clear about the ramifications of failing to place children in the backseat. The instruction reads:

> If possible, place children in the rear seat of your vehicle. Accident statistics suggest that children are safer when properly restrained in rear seating positions than when they are restrained in front seating positions.

Appellant's App. at 95. The instruction uses equivocal language: "if possible," put children in the back seat where statistics "suggest" they are safer. The instruction does not address the role of airbags in either increasing or decreasing the safety of children in the front seat. Peter testified that to him, that language is not a "specific direction" but only "hint[s] at" the backseat as the safest place for a child and the reasons why. Appellant's App. at 142. When asked if, having now read all of the relevant instructions in the owner's manual, he would have put Lindsey in the backseat, Peter testified:

> No. Because at the time I didn't think that the airbag could kill her, so ... As a matter of fact, I thought the airbag might be a cushion for her in the front seat, so there would be no reason for me to have her go in the back seat, even reading that....

*Id.* at 147. Whether the backseat instruction, in conjunction with the airbag instruction, is adequate to warn of the dangers to children of airbag deployment and whether the Cooks' failure to follow the backseat instruction was a reasonably foreseeable intervening cause is, again, a question of fact properly reserved for the jury. Thus,

Lindsey had unbuckled herself or not making sure she was re-buckled quickly enough was a foreseeable intervening cause. However, there is no designated evidence in the record regarding how long Lindsey had been unbuckled prior to the accident, when (or if) Lori noticed that she was unbuckled, or what Lori did upon noticing Lindsey was unbuckled. Lori's conduct also would be a question of fact for the jury.

15. In fact, the foreseeability of failure to wear a seatbelt is what prompted the requirement that passive restraint systems be installed in vehicles. *See Geier,* 529 U.S. at 875, 120 S.Ct. 1913 ("In 1967, DOT, understanding that seatbelts would save many lives, required manufacturers to install manual seatbelts in all automobiles. It became apparent, however, that most occupants simply would not buckle up their belts. DOT then began to investigate the feasibility of requiring 'passive restraints,' such as airbags and automatic seatbelts. In 1970, it amended [Standard] 208 to include some passive protection requirements ....") (citations omitted).

Ford was not entitled to summary judgment on the issue of proximate cause.

Although a jury may very well find for Ford with regard to the breach of its duty to warn or the proximate cause of Lindsey's injury, we cannot say that the designated evidence leads to but a single inference so as to render the issues questions of law, not fact. Ford failed to negate an element of the Cooks' failure to warn claim as a matter of law, and summary judgment was therefore inappropriate. Accordingly, the trial court's grant of summary judgment to Ford on the Cooks' failure to warn claim is reversed and this case is remanded for further proceedings.

## II. Ford's Cross–Appeal

### A. Facts Relevant to Cross–Appeal

As the parties discussed preliminary jury instructions prior to the start of the first trial in this cause, the Cooks stated that they were alleging, in part, that the airbag in their truck was defective because it should not have deployed at all or should not have deployed as aggressively under the low-speed impact conditions of this accident. Ford objected to this claim of defect, claiming it had not been previously raised. The trial court overruled Ford's objection and instructed the jury that the Cooks alleged, in part, "the passenger air bag system, including the design and location of its sensors, was not properly designed, as the air bag should not have deployed in this accident, and that if it deployed it should have deployed significantly less aggressively." Tr. at 102. In pre-trial evidentiary discussions, Ford objected to the Cooks' use of deposition testimony of certain experts retained by Ford, including Jeffrey Pearson, during the Cooks' case-in chief. The Cooks noted that Pearson's testimony concerning his work on dual-stage airbags in the 1970s was crucial to their case. The trial court took the evidentiary issue under advisement.

During opening statements, the Cooks made the following statements:

> There's going to be a lot of evidence in this case that there are a lot of people in America that have been injured by airbags deploying at levels they shouldn't. There's also going to be evidence of other designs of airbags that would deploy airbags with aggressivity, or power, that's lower than was present in this [truck].

Tr. at 138. The Cooks referenced Ford's expected position that the dual-stage or de-powered airbags were not feasible when the Cooks' truck was manufactured and Pearson's expected testimony that such airbags were "well engineered and well tested" in the early 1970s.

Following opening statements, the trial court ruled that if the Cooks wished to present Pearson's testimony in their case-in-chief, they would have to do so by calling him as a witness rather than by introducing excerpts from his deposition. *See* Tr. at 191 (The Court: "On the issue of the plaintiffs using excerpts of depositions from witnesses who will be called on the defendant's case in chief, those witnesses are clearly available and ... I think you need to get that evidence from them live ... unless there's going to be some proof that they are not available to the plaintiff").

Prior to the testimony of the Cooks' biomechanical engineer expert witness, Dr. Carley Ward, the parties and the trial court engaged in a lengthy discussion of the parameters of Dr. Ward's testimony regarding de-powered airbags. The Cooks represented that "there's a large amount of information that would support the foundation for any opinions about de-powering in the defense expert testimony ... that I would like to play in the plaintiffs'

case in chief that actually support, in fact lay out unequivocally, that raising thresholds is certainly feasible," *id.* at 682–83, specifically citing Pearson's deposition testimony. In response to the Cooks' assertion that "there isn't any testimony that it's not feasible to shift thresholds," *id.* at 702, and their reference to testimony expected from Ford's experts, the trial court noted that evidence of feasibility had to first be introduced in the Cooks' case-in-chief: "You can't rely on their case in chief to prove your case in chief, obviously. I mean, [evidence of feasibility] has to come in before you rest." *Id.* at 703. The Cooks noted that they "had meant to get most of [the feasibility evidence] in through Jeffrey Pearson." *Id.* at 909. Dr. Ward was called to make an offer of proof, at the conclusion of which the trial court stated:

> I think she laid a sufficient foundation under 702 to testify that the de-powered bag leads to fewer injuries under this kind of accident that we're talking about today to children.
>
> I don't think you can get into the individual cases that you claim are substantially similar, but I thought that her testimony sufficient—her education, experience, the literature she reviewed, her involvement in this exact issue of the deployment of airbags, I do think that her testimony can go to the jury on that.
>
> But I still think you have the feasibility issue on the threshold question.
> * * *
> The other aspect, is she the one you're going to rely on—I mean, I don't think she can say that her injuries would be twenty percent less. That was a guess.

Tr. at 928–29. The Cooks again expressed their desire to introduce excerpts of Pearson's deposition to lay a foundation for the deployment threshold claim. At some point prior to Dr. Ward's testimony, the court indicated that it was going to go through the Cooks' expert deposition testimony designations and Ford's objections thereto, *see* tr. at 955, and it was apparently contemplated that at least some of the deposition testimony would be played to the jury, *see id.* at 962 (Ford's counsel: "I think the most efficient way to do it would be to have you rule, and then—because then that will tell us exactly what it is that is going to played."). The trial court indicated that it was going "to revisit the issue of the Pearson deposition. . . . I think we need to discuss it again." *Id.* at 964. The trial court subsequently decided that the Cooks could use excerpts of Pearson's deposition. *Id.* at 1212. Before Dr. Ward testified, the trial court and the Cooks' counsel clarified the acceptable parameters of her testimony with regard to de-powered airbags and deployment thresholds. *See* Tr. at 1217.

The Cooks subsequently decided not to use Pearson's deposition testimony or call him as a witness in their case-in-chief, instead stating that they were "fine with using him in [Ford's] case in chief." Tr. at 1409. The Cooks called several more witnesses and then rested their case-in-chief. In arguing their motion for directed verdict, Ford eventually moved for a mistrial because Dr. Ward's testimony regarding de-powered airbags was unsupported by any foundational evidence given that Pearson's deposition testimony was not used nor was he called as a witness. The trial court granted the mistrial:

> I thought—clearly thought that we were going to be hearing from Ford employees, and I had an expectation of a certain kind of testimony. And I thought that we were going to hear—I mean, I agree that there was a representation that we were going to hear some evidence about threshold deployment was feasible at a higher miles per hour, some

other claim along those lines, and also the de-powered bag.

And there's no way this can possibly go to the jury on anything with the evidence that's in with respect to the de-powered bag. I think half the evidence that came in really was related to that, and I allowed it in because I thought that we were going to hear some testimony specifically on that point.

... I don't think there was any—I'm not inferring any kind of, you know, misconduct on your behalf, [Cook's counsel], at all.

*Id.* at 1679–80. Ford subsequently filed a motion seeking reimbursement of the attorney fees and costs it incurred during the first trial.[16] Ford cross-appeals the trial court's denial of this motion.

### B. Motion for Costs

&#9608; Ford's motion for costs apparently alleged that the Cooks failure to lay the foundation for a claim of defect for lack of de-powered airbags constituted contempt of a court order. In order to be held in contempt for failure to follow a court order, a party must have willfully disobeyed the court's order. *City of Gary v. Major,* 822 N.E.2d 165, 170 (Ind.2005). The order must be so clear and certain that there is no question what the party must do, or not do, so there can be no question whether the order is violated. *Id.* The determination of whether a party is in contempt is left to the discretion of the trial court. *Id.* at 171. Once a party has been found in contempt, monetary damages may be awarded to compensate the other party for injuries incurred as a re-

sult of the contempt. *Id.* at 172. This, too, is a matter left to the trial court's discretion. *Id.*

Ford's argument rests on its belief that the trial court's statement to the Cooks that they had to prove feasibility in their case-in-chief was an order. *See* Brief of Appellee and Cross–Appellant at 19 (citing Tr. at 703 for the proposition that the trial court "ordered that the Cooks present the foundation evidence during their case-in-chief"); Reply Brief of Cross Appellant at 1 ("the trial court orally ordered Plaintiffs' counsel to present foundation evidence to support their de-powered airbag claim in their case-in-chief"). This interpretation seems to overstate the import of the trial court's remarks. We believe the trial court was making a general comment on the burden of proof rather than ordering the Cooks to introduce specific evidence. Without a clear order, a party may not be held in contempt. *See Major,* 822 N.E.2d at 170. Further, although Ford characterizes the Cooks' conduct as "willfully disobey[ing]" the trial court's order regarding foundational testimony, *see* reply brief of cross appellant at 1, the trial court specifically stated when it granted the mistrial that it was not implying any misconduct on the part of the Cooks' counsel. A subsequent written order stated, "The court finds that the plaintiff made misrepresentations regarding the intended presentation of relevant and necessary foundational evidence for a theory of the plaintiff's case when plaintiff knew he could not lay such a foundation in this trial." Appellant's App. at 20.[17] Given that the trial court was involved in several years of pre-trial pro-

---

16. This motion does not appear in the record before us; nor does a written order regarding the mistrial referenced by Ford in its cross-appeal brief. *See* Brief of Appellee and Cross Appellant at 19 (quoting from a February 23, 2007 order without citation to the record).

17. The trial court issued a written order on the mistrial that was omitted from the chronological case summary and added at a later date. We do not, as stated above, have a copy of the actual order in the record before us, but have quoted from the corrected CCS entry.

ceedings and was present for the eight days of testimony and numerous evidentiary arguments, given that the existence of an actual order which the Cooks could be in contempt for failing to obey is at best questionable, and given that, at best, the trial court's findings regarding the Cooks' culpability in disobeying any such order are equivocal, we cannot say that the trial court abused its discretion in denying Ford's motion for fees and costs.

### Conclusion

The trial court did not abuse its discretion in denying Ford's motion for fees and costs incurred during the first trial of this cause. Standard 208 as it applies to airbag warnings in the owner's manual provides a minimum standard that does not preempt the Cooks' claim that Ford's warnings were inadequate. There is a genuine issue of material fact as to whether Ford breached its duty to warn and whether its breach, if any, was a proximate cause of Lindsey's injury; the trial court's grant of summary judgment is reversed and we remand for further proceedings consistent with this opinion.

Affirmed in part; reversed and remanded in part.

CRONE, J., concurs.

BROWN, J., concurs in part and dissents in part with separate opinion.

BROWN, Judge, concurring and dissenting.

I respectfully concur in part and dissent in part. I concur with the majority's analysis and determination of the first issue that the duty the Cooks seek to impose was not in conflict with Standard 208, nor was Standard 208 an obstacle to the accomplishment and execution of federal objectives, and therefore the cause of action was not preempted under the Supremacy Clause of the United States Constitution.

As to the second issue, I respectfully dissent.

I agree with the majority that Ford owed the Cooks a duty to warn of the dangers associated with their truck's airbags. I disagree with the majority's conclusion that there exists a genuine issue of material fact that Ford was in breach of that duty. As stated by the majority, the duty to warn consists of two parts: (1) to provide adequate instructions for safe use; and (2) to provide a warning as to dangers inherent in improper use. *Coffman v. PSI Energy, Inc.*, 815 N.E.2d 522, 527 (Ind.Ct. App.2004), *reh'g denied, trans. denied.* In the truck's instruction manual, Ford directed the following, which Peter admits to having read:

- Keep the passenger air bag turned on unless there is a rear-facing infant seat installed in the front seat. When the passenger air bag switch is turned off, the passenger air bag will not inflate in a collision.

- If the passenger air bag switch is turned off, it increases the likelihood of injury to forward facing occupants in the passenger seat.

Appellant's Appendix at 150. In addition, the manual contained the following additional warnings, which Lori and Peter chose not to read:

- <!> All occupants of the vehicle, including the driver, should always wear their safety belts.

- <!> To prevent the risk of, [sic] injury, make sure children sit where they can be properly restrained.

- <!> It is extremely dangerous to ride in a cargo area, inside or outside of a vehicle, [sic] In a collision, people riding in these areas are more likely to be seriously injured or killed. Do not allow people to ride in any area of

your vehicle that is not equipped with seats and safety belts.

Be sure everyone in your vehicle is in a seat and using a safety belt properly.

- Always follow the instructions and warnings that come with any infant or child restraint you might use. If possible, place children in the rear seat of your vehicle. Accident statistics suggest that children are safer when properly restrained in rear seating positions than when they are restrained in front seating positions.

*Id.* at 94–95. Also, Ford put warnings on the truck's sun visor, including:

- For maximum safety protection in all types of crashes, you must always wear your safety belt.

*Id.* at 97. Peter and Lori admit that they also did not read the warnings on the truck's sun visor. *Id.* at 60, 71–72. Despite the fact that the Cooks had available rear seating, they went against Ford's instructions and placed Lindsey in the front passenger seat. Also, it is undisputed that Lindsey had removed her safety belt at the time of the accident. All parties agree that had Lindsey been in the back seat when the crash occurred, she would not have been injured. *Id.* at 62–64, 90–92.

The majority cites *Ford Motor Co. v. Rushford,* 845 N.E.2d 197 (Ind.Ct.App. 2006), *rev'd on other grounds,* which sets forth the applicable legal standard. In *Rushford,* we held that failure to warn

issues may be evaluated as a question of law "where the facts are undisputed and only a single inference can be drawn from those facts." *Id.* at 202 (citing *Northern Ind. Pub. Serv. Co. v. Sharp,* 790 N.E.2d 462, 466 (Ind.2003). Here, there is no dispute that the above warning was contained in the owner's manual for the Cooks' truck. Also, it is undisputed that it was certainly "possible" for the Cooks to have seated Lindsey in the rear seat as they were directed. Based on this evidence I can draw only the single inference that the Cooks failed to comply with Ford's adequate warning to seat children in the rear of the vehicle and to always wear their safety belts. *See also In re Air Bag Products Liability Litigation,* 7 F.Supp.2d 792, 797–799 (E.D.La.1998) (holding that language from the 1996 Ford Contour's owner manual, which states in part that "[w]hen possible, put children in the rear seat," was an adequate cautionary instruction and therefore a reasonably prudent buyer should have discovered the risk presented by air bags prior to sale).

For these reasons, I respectfully concur in part and dissent in part.