**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEYS FOR APPELLANT:

**BRUCE P. CLARK**
**COURT L. FARRELL**
Bruce P. Clark & Associates
St. John, Indiana

ATTORNEY FOR APPELLEE:

**THERESA M. RINGLE**
Ringle Law Group, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SCOTWOOD INDUSTRIES, INC., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 29A05-1305-SC-229 |
| | ) | |
| DAVID MEATS, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Gail Z. Bardach, Judge
The Honorable David K. Najjar, Magistrate
Cause No. 29D06-1209-SC-10042

**February 6, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Scotwood Industries, Inc., ("Scotwood") appeals the trial court's product liability judgment against it in favor of David Meats. We reverse.

**Issues**

Scotwood raises several issues but we address only one dispositive issue: whether there is sufficient evidence to support a judgment against Scotwood under the Indiana Product Liability Act ("IPLA").

**Facts**

In the fall of 2010, Meats applied a concrete sealing product manufactured by Valspar, Inc., ("Valspar") to the driveway of his home in Noblesville. The labeling on the product indicated that it could protect concrete from "salt, UV rays & chemicals." Ex. 2. In February 2011, a large ice storm hit the central Indiana area, leaving approximately two to four inches of solid ice on Meats's driveway. To try to remove the ice, Meats purchased a bag of Prestone Driveway Heat ("Heat"), which is distributed nationally by Scotwood. The active ingredient in Heat is calcium chloride.

The Heat bag was labeled with the following instructions:

> READ BEFORE USE
>
> Driveway Heat® ice melter should not be used on concrete surfaces that are less than one year old, precast steps, masonry (stone or brick), mortar joints, porous concrete, chipped, cracked or improperly cured concrete, or concrete with exposed aggregate.
>
> USE PRECAUTIONS

Independent testing shows that Driveway Heat® ice melter is safer to use on concrete surfaces than most commonly used de-icers like rock salt. However, all snow and ice melters may be harmful when used excessively or repeatedly on concrete surfaces.

Quality concrete is considered to be air-entrained concrete that is designed to withstand the damage associated with naturally occurring cycles of thawing and refreezing. Use of any ice melting agent may increase the number of such cycles. The frequency is also controlled by the weather itself. When used in heavy and repeated applications, Driveway Heat® ice melter may contribute to scaling or flaking of concrete surfaces. *To reduce the risk of scaling or flaking, quickly remove slush that results from the melted ice and snow*.

DIRECTIONS

1.     Sprinkle Driveway Heat® ice melter on area to be de-iced, evenly apply 2 to 4 ounces (1/4 to 1/2 cup) per square yard. Do not overapply. If snow is more than 2 inches in depth, all de-icers are impractical so it will be necessary to plow or shovel before applying the product.

2.     Allow Driveway Heat® ice melter to work for 10 minutes to melt the bond beween the ice and surface.

3.     Remove melted ice and snow. Keep bag tightly closed when not in use.

Ex. 6.

After Meats applied Heat to his driveway, it failed to melt the thick sheet of ice during the next thirty-six hours. Meats then left home for ten days on a vacation. When he returned, he found the ice had melted and that there was extensive damage to his driveway in the form of chips and pockmarks that had not been there before he applied the Heat.

Meats filed a small claims complaint against Valspar and Scotwood. During trial, Meats presented expert testimony that his driveway had been damaged by the calcium chloride in Heat. He also argued in part that calcium chloride is not in fact safer to apply to concrete than rock salt, as claimed on the Heat packaging, and also that the instructions for applying the product were unclear. With respect to Valspar, Meats contended that its concrete sealant product did not protect his driveway from salt as advertised. At the conclusion of the hearing, the trial court entered judgment in Meats's favor in the amount of $6000 against both Valspar and Scotwood. Scotwood filed a motion to correct error, arguing in part that the trial court erred in failing to apportion fault between it and Valspar. In denying the motion to correct error, the trial court stated that it was entering judgment against Scotwood and Valspar jointly and severally. Valspar subsequently paid $3,288.06 to Meats, and he agreed to release Valspar from further liability. Scotwood has elected to appeal the judgment against it.

**Analysis**

When we review a judgment in a small claims action, a clearly erroneous standard applies to review of facts found by the trial court with due regard given to the trial court's opportunity to assess witness credibility. Trinity Homes, LLC v. Fang, 848 N.E.2d 1065, 1067 (Ind. 2006). This deferential standard of review is especially important in small claims actions, because trials are "informal, with the sole objective of dispensing justice between the parties according to the rules of substantive law . . . ." Id. at 1067-68 (quoting Ind. Small Claims Rule 8(A)). This deferential standard does not apply to the substantive

4

rules of law, however, which are reviewed de novo just as they are in appeals from a court of general jurisdiction. Id. at 1068.

The IPLA governs all actions brought by a user or consumer of a product against a manufacturer or seller for harm caused by the product, regardless of the substantive theory or theories upon which the action is brought. See Cook v. Ford Motor Co., 913 N.E.2d 311, 319 (Ind. Ct. App. 2009) (citing Ind. Code § 34-20-1-1), trans. denied. A product may be defective within the meaning of the IPLA because of a manufacturing flaw, a design defect, or a failure to warn of dangers in the product's use. Id. Meats argues solely that Scotwood failed to provide adequate instructions or warnings regarding the use of Heat. In other words, he does not attribute the damage to his driveway to any inherent problem or defect with Heat, as opposed to Scotwood's failure to properly instruct him and other consumers on the safest way to use the product to avoid concrete damage.[1]

Indiana Code Section 34-20-4-2 specifically provides:

> A product is defective under this article if the seller fails to:
>
> (1) properly package or label the product to give reasonable warnings of danger about the product; or
>
> (2) give reasonably complete instructions on proper use of the product;
>
> when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer.

---

[1] Meats also does not develop any argument on appeal that the Heat labeling was misleading in stating that it was safer to apply to concrete than rock salt.

"[I]n an action based on . . . an alleged failure to provide adequate warnings or instructions regarding the use of the product, the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances . . . in providing the warnings or instructions." I.C. § 34-20-2-2. As indicated by the repeated use of the word "reasonable" or "reasonably" in these statutes, the adequacy of a product's labeling is governed by negligence principles. Montgomery Ward & Co. v. Gregg, 554 N.E.2d 1145, 1163 (Ind. Ct. App. 1990), trans. denied. A product label must make apparent any potential harmful consequences with such intensity as to cause a reasonable person to exercise caution for his or her own safety commensurate with the potential danger. Jarrell v. Monsanto Co., 528 N.E.2d 1158, 1162 (Ind. Ct. App. 1988), trans. denied. Factors to consider when assessing a product's labeling include the adequacy of the label's factual content, the adequacy of the manner in which that content is expressed, and the adequacy of the method of conveying that content. Id. at 1162-63. Also, to be liable for a failure to warn, the product in question must be "unreasonably dangerous," which requires more than a showing that the product failed and caused injury. Whitted v. General Motors Corp., 58 F.3d 1200, 1206 (7th Cir. 1995) (applying Indiana law). Whether a particular product's labeling constitutes a breach of the duty to warn is generally a question of fact, but can become a question of law when the facts are undisputed and only a single inference can be drawn from those facts. Cook, 913 N.E.2d at 327.

We note that Meats does not contend that the general method and manner in which Heat was labeled was inadequate, i.e., he does not argue that the warnings and instructions

6

were not prominently displayed.  There also is not dispute regarding the content of the labeling.

Meats points to three alleged deficiencies in the content of Heat's labeling.  First, he argues that the labeling's "READ BEFORE USE" section, with its warnings regarding types of concrete or masonry that Heat should not be used on, is unclear and ambiguous and uses technical terms ordinary laypersons would not understand.  We disagree that this warning is insufficient.  The label says Heat "should not be used on concrete surfaces that are less than one year old, precast steps, masonry (stone or brick), mortar joints, porous concrete, chipped, cracked or improperly cured concrete, or concrete with exposed aggregate."  Ex. 6.  Of all this language, the only word or phrase that might be vague to a reasonable layperson is "improperly cured concrete," as such an imperfection might not be readily apparent.  Still, we do not believe Scotwood was obligated to spell out how to determine whether concrete has been "improperly cured," rather than alerting consumers to the fact that Heat's use on such concrete may be harmful.  Also, Meats makes no argument that Heat is inherently defective or unreasonably dangerous because it may cause harm to concrete with a difficult-to-detect flaw.

On this same general issue, Meats contends that the labeling is vague and ambiguous in describing "[q]uality concrete" as "air-entrained concrete that is designed to withstand the damage associated with naturally occurring cycles of thawing and refreezing."  Id.  We accept that the average layperson would not know the meaning of "air-entrained concrete" or how to determine whether one's driveway was made of "air-entrained concrete."  However, Meats's own expert witness testified that Indiana building contractors almost

7

always use "air-entrained concrete" for outdoor construction such as driveways, and also that if Meats's driveway was not made of "air-entrained concrete" that it should have shown signs of excessive wear many years ago, but it did not.[2]  In order to establish a claim of inadequate product labeling, a plaintiff must prove that a seller's failure to adequately warn of a hazard was a proximate cause of injury, or in other words "that the danger that would have been prevented by an appropriate warning was the danger that materialized in the plaintiff's case."  Kovach v. Caligor Midwest, 913 N.E.2d 193, 199 (Ind. 2009).  Given that Meats's own expert indicated that his driveway was most likely constructed of "air-entrained concrete," any vagueness or ambiguity in that term was not a proximate cause of Meats's injury.  Also, as with the phrase "improperly cured concrete," Meats makes no argument that it was improper, given the difficulty a layperson would have in assessing whether his or her driveway was made of "air-entrained concrete," for Scotwood to sell a driveway ice removal product that could damage non-"air-entrained concrete."

Meats's second argument regarding the labeling is that it was unclear regarding the removal of Heat from the driveway after ice has melted.  The labeling stated, emphasized in italics, "*To reduce the risk of scaling or flaking, quickly remove slush that results from the melted ice and snow*."  Ex. 6.  The labeling also instructed the consumer to "[r]emove melted ice and snow" after allowing ten minutes for Heat to work.  Id.  Meats contends that the first warning is inadequate because it follows a sentence stating that, "heavy and repeated applications [of Heat may] . . . contribute to scaling or flaking of concrete

---

[2] The expert also testified that the only way to determine whether a particular driveway is made of "air-entrained concrete" is to obtain a sample of it and submit it to laboratory testing.

8

surfaces," and there is no evidence or argument by Scotwood that Meats used Heat "heavily or repeatedly." Id. Scotwood does contend, however, that Meats used Heat "excessively" by leaving it on his driveway for a long period of time; "excessive" appears on the labeling in conjunction with a warning that "excessive" use of the product may harm driveways. Id. We believe reading the labeling as a whole gives clear warning to consumers that Heat should not be left on driveways for long periods of time.

That warning is emphasized by the second reference to removing Heat after ice has melted; Meats contends this instruction does not indicate what a consumer should do if Heat has failed to melt ice within ten minutes, as happened in his case. We disagree. This second reference to the need to remove Heat from a driveway, especially in conjunction with the earlier warning to "quickly" remove Heat from a driveway, should have given Meats clear notice that it was dangerous to leave the product on his driveway indefinitely, even if it took the ice longer than ten minutes to melt.

Meats's third argument regarding the labeling is that it did not provide clear instructions regarding the amount of product to use in order to avoid "heavy" or "excessive" application. We again disagree. The instructions state to use "2 to 4 ounces (1/4 to 1/2 cup) per square yard." Id. Meats seems to suggest that the average consumer would not know how to measure the square yardage of a driveway, but we believe it would be a fairly rudimentary calculation for any consumer with a yardstick or tape measure. Also, Meats contends the reference to "2 to 4 ounces" is unclear as to whether it refers to weight or volume ounces. It is patently clear, however, that it refers to volume ounces, given the alternative measurement of "1/4 to 1/2 cup." In sum, after a consumer is able to

9

calculate the size of their driveway in square yardage, they could measure out the total appropriate amount of Heat to use in either volume ounces or cups and then apply it evenly over the driveway in accordance with the clear labeling instructions.

We emphasize that the IPLA only requires "reasonableness" with respect to a product's labeling, not 100% perfection or anticipation of every possible contingency that might arise with the product's use. In accordance with this standard, we conclude as a matter of law that Heat's labeling is not defective. It adequately informs consumers of possible dangers associated with its use and gives reasonably complete instructions on how to use it properly, as required by Indiana Code Section 34-20-4-2. As such, Meats failed to prove that Heat was a "defective" product under the IPLA.[3]

## Conclusion

Because Heat's product labeling is adequate as a matter of law and Meats makes no argument that the product is otherwise "defective" under the IPLA, we reverse the judgment in Meats's favor against Scotwood.

Reversed.

ROBB, J., and BROWN, J., concur.

---

[3] Given our resolution of this issue, we need not address Scotwood's alternative arguments that the trial court denied it due process in the manner in which it conducted the bench trial, or that it erred in failing to apportion fault between it and Valspar. Also, because we are reversing the judgment in Meats's favor, it goes without saying that we also deny his request for appellate attorney fees.